IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORIAN E. FLIPPIN, | No. C 07-0169 MMC (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| JAMES TILTON, | |
| Respondent. | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed January 10, 2007 by petitioner Dorian E. Flippin pursuant to 28 U.S.C. § 2254; petitioner, who proceeds pro se, challenges the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse.

## I. PROCEDURAL HISTORY

In 2001, in the Superior Court of Contra Costa County, petitioner was convicted of first degree murder and personal use of a firearm. (People v. Flippin, No. A098086 (Cal. Ct. App. Aug. 24, 2004) (hereinafter, "Ex. 9") at 1, 5.)[1] The trial court sentenced petitioner to a term of 29 years to life in prison. (Id. at 5.)

In a reasoned opinion, the California Court of Appeal affirmed the trial court's

---

[1] All references to exhibits herein are to exhibits submitted by respondent in support of the answer.

decision (id. at 1), and the California Supreme Court summarily denied the petition for review (Ex. 13). In addition to his direct appeal, petitioner filed state habeas petitions in the Contra Costa County Superior Court, California Court of Appeal, and California Supreme Court (Exs. 14, 17)[2]; all said petitions were denied, the last two summarily. (Exs. 15, 16, 18).

Thereafter, on January 10, 2007, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> [Petitioner] was accused of shooting Kenneth Dale on November 8, 1995. The primary trial issue was the killer's identification. Dale had purchased cocaine from [petitioner] and apparently owed him money. Four or five days before the killing, [petitioner] mentioned the debt to the victim's brother and warned, "Tell your brother when you see him he better have my money or I'm going to bust a cap in him."
>
> Officers responding to the murder scene found Dale lying in the driveway of a Richmond home. [Garrett] Spearman and his girlfriend Alicia Moore were interviewed at the scene and told police they had been inside a nearby residence when the shooting occurred. Dale was shot five times, and the autopsy surgeon opined that three of the wounds were inflicted when Dale was on the ground.
>
> Spearman was arrested at the scene pursuant to a probation violation warrant. Initially he refused to provide details of the shooting until the police agreed to help him with his probation situation. When Officer Dominic Medina told Spearman that he could make no promises, Spearman said he had been in the home of Leslie "Cookie" Ross when Dale and the unidentified shooter argued over Dale's $10 drug debt. The shooter became very agitated and left after Dale laughed at his payment demand. Later, Spearman heard gunshots and went outside to find Dale on the ground.
>
> Officer Medina told Spearman's probation officer that Spearman was assisting in a murder investigation, and the probation officer agreed to inform the court of Spearman's cooperation. Spearman then identified [petitioner] as the shooter, recanted certain details and provided additional ones. He said that after [petitioner] left Cookie's house, Spearman and Moore went outside to work on a car. [Petitioner] returned a short time later and yelled for Dale to come outside. [Petitioner] and Dale argued and [petitioner] again demanded money. Spearman heard gunshots, looked up and saw Dale collapse. [Petitioner] walked closer to Dale, shot him again and fled.

---

[2] Respondent has not provided as an exhibit petitioner's state habeas petition to the Court of Appeal.

2

Because Spearman could not be located to testify at [petitioner's] preliminary hearing in 1996, the charges were dismissed. In 2000, Spearman was sentenced to two years in prison. He wrote to the district attorney's office offering to testify against [petitioner] in exchange for an early release and other consideration. Spearman explained he had been unwilling to testify in 1996 because he had been threatened. In an interview with Sergeant Mark Weikel, Spearman repeated his earlier statement that he saw [petitioner] shoot Dale over a drug debt and advised Weikel that he was still concerned for his safety.

Spearman testified at [petitioner's] February 2001 preliminary hearing. In that testimony, Spearman denied seeing [petitioner] shoot Dale. He said he never heard [petitioner] and Dale argue about a drug debt and that he was inside the house when Dale was shot. When he emerged after the shooting, he did not see [petitioner]. Spearman admitted identifying [petitioner] as the shooter after he was told his probation officer would recommend a release from custody. However, he testified that the details he then provided were untrue. After his imprisonment, Spearman wrote to the district attorney because he was willing to do anything to secure his release. He acknowledged meeting with Sergeant Weikel, but asserted his Fifth Amendment privilege when questioned about the statement he gave. Spearman denied that [petitioner] ever threatened him. He claimed he identified [petitioner] as the shooter because [petitioner] had earlier damaged one of his cars with a baseball bat.

A district attorney's investigator testified at trial that when Spearman arrived for the preliminary hearing, he expressed fear of retaliation. Before that hearing, Spearman admitted he "may not have been entirely truthful" in his interview with Sergeant Weikel. Spearman refused to review his statement to Weikel and requested the assistance of an attorney before testifying.

Alicia Moore testified at trial that she was across the street at Jackline Wilson's house when the shooting occurred. She and Spearman had been working on the car, but were not outside when Dale was murdered. When Spearman was in custody in 2000, he sent his girlfriend to tell Moore that he was in "big trouble" and that Moore should identify [petitioner] as Dale's killer. Moore later lied to Sergeant Weikel to secure Spearman's release.

Moore was impeached with her 2000 statement that she saw [petitioner] shoot Dale. In that statement, Moore explained that on the night of the murder, [petitioner] and Dale argued in Cookie's house over $10. Later that evening, Moore and Spearman were outside when [petitioner] returned, went to the front door and called for Dale. As soon as Dale stepped off the porch, [petitioner] pulled out a gun, saying, "Yeah, yeah, now what you got to say? Now what you got to say?" Dale called [petitioner] a "punk" and challenged him to shoot. The two men continued to argue and [petitioner] shot Dale four or five times. [Petitioner] fled after telling Moore, "You all ain't seen nothing."

Jackline Wilson testified that she lived across the street from Cookie Ross. Spearman and Moore came to her home only after the shooting and Moore was hysterical. Wilson told the district attorney's investigator that Moore said she had seen "everything." On cross-examination, Wilson was impeached with her statement to police that when Moore and Spearman came to her house after the shooting, they engaged in casual conversation and watched television.

3

> Joy Wolf, Moore's sister, testified that she drove to Richmond and met Moore after the killing. Moore, who was crying and fearful, confided that she had just seen a shooting involving two men who had argued over $10. One man left but returned later and shot the other while she and Spearman were working on their car.
>
> Milton Parker had been inside Cookie Ross's house with Spearman, Moore and Dale. He initially told police that, after Spearman and Moore went outside, someone knocked on the door. Dale left the house and 10 minutes later Parker heard gunshots. Looking out, he saw Dale on the ground.
>
> A week later, Parker informed investigators that [petitioner] had been in Cookie's house talking with Dale before the murder. Parker did not hear the conversation because the two men were whispering. However, at one point he heard [petitioner] say, "Okay, I'll wait til Friday then." [Petitioner] left the house. Shortly thereafter someone knocked at the door and Dale went outside. Parker heard gunshots, looked, and saw that Dale had been shot. He saw no one else. At trial, Parker recanted his statements and testified that he saw and heard nothing because he had been asleep.
>
> The prosecution introduced a redacted version of a letter [petitioner] wrote to another inmate three weeks before trial. The letter stated: "'Tay' [¶] Whats up my nigga? I hope everything's cool wit you. Check it out, my trial starts this month so I wanted to touch bases wit you. I don't know if the DA will subpoena you or not but just in case. Remember I was wit you till about 11 or 11:30 that night. (anytime around then you don't have to be specific cuz it was 6 years ago) After that I got a ride to my baby momma house. I told you thats where I was going thats how you knew. Thats all you know. I know the police spooked niggaz into saying I wasn't wit em so make sure you tell em that. Tell em you didn't know what I couldve done after I left you, but I was wit you till about 11:30. If you can get in contact wit Joe tell him if they subpoena him don't come at all! period! It might not come down to all this but I want niggaz ready just in case. [ . . . ] I'm takin this shit to trial cuz they got no physical evidence and they witnesses came to court and said they lied on me to get out of jail so I got action at winning. Memorize this shit and throw this letter away. Take care my nigga n keep yo head up. [¶] One Love. [¶] Doe"

(Ex. 9 at 1-5.)

### III.  DISCUSSION

A.  <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

4

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

      A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

      Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

      Here, the California Supreme Court summarily rejected the claims petitioner raises in the instant petition. (Exs. 13, 18.) The Court of Appeal, in its opinion on direct review (Ex.

5

9), addressed three of the four claims petitioner raises in the instant petition.[3] The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). As to the fourth, the Court need not review such claim on the merits, as petitioner alleges only a violation of state law, which claim is not cognizable in federal habeas corpus proceedings.[4]

B.   Petitioner's Claims

Petitioner claims that: (1) the trial court erred in admitting preliminary hearing testimony of an unavailable witness and two officers, thereby violating petitioner's Sixth Amendment rights under the Confrontation Clause; (2) his trial counsel was ineffective in failing to object to the admission of the preliminary hearing testimony, thereby violating petitioner's Sixth Amendment right to counsel;[5] (3) the trial court improperly failed to instruct the jury on voluntary intoxication as a defense, thereby violating petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments; and (4) the trial court improperly imposed a restitution fine, thereby violating petitioner's Eighth Amendment right to be free from excessive fines.

---

[3] See infra, discussion of claims 1-3.

[4] See infra, discussion of claim 4.

[5] In his traverse, petitioner improperly raises the additional claim that his counsel was ineffective in failing to introduce evidence regarding gunshot residue results. Although petitioner raised the claim in his petition to the Superior Court, which denied the claim in a reasoned decision, "[a] [t]raverse is not the proper pleading to raise additional grounds for relief" on federal habeas. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994). Additional claims should be presented "in an amended petition," in response to which the state can file an answer. Id. The Court thus will deny relief as to such additional claim.
  Even if the Court were to consider such claim, however, the Court's ruling would remain unchanged as the record is devoid of any evidence to support a finding as to the nature of such results, let alone a finding that any such result arguably was favorable to petitioner, whether his counsel had a tactical reason for not introducing it, and whether petitioner was in any manner prejudiced thereby. Petitioner's conclusory assertion as to the results (see Decl. in Supp. of Traverse) is insufficient to support his claim, and, indeed, is inconsistent with his counsel's description thereof in a pretrial discussion with the trial court and prosecutor (see RT at 1122 (describing results as "inconclusive")).

6

1. <u>Confrontation Clause Claim: Admission Of Preliminary Hearing Testimony</u>

Petitioner claims the admission of preliminary hearing testimony given by Garrett Spearman ("Spearman"), Officer Dominic Medina ("Officer Medina"), and Officer Mark Weikel ("Officer Weikel") violated his Sixth Amendment rights under the Confrontation Clause. (Pet. at 5.)

a. <u>Legal Standard</u>

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. <u>Crawford v. Washington</u>, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. <u>Id.</u>; see <u>Davis v. Alaska</u>, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the Confrontation Clause "is the right of cross-examination"). The right to cross-examine under the Confrontation Clause provides the opportunity to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." <u>Davis</u>, 415 U.S. at 318.

The Confrontation Clause applies to all "testimonial" statements. <u>Crawford</u>, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." <u>Id.</u> at 51 (internal quotation and citation omitted). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." <u>Id.</u> Out-of-court statements by witnesses that are "testimonial" in nature are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. <u>Id.</u> at 59. The absence of such opportunity is itself enough to make out a Confrontation Clause violation. <u>Id.</u> at 68. The Confrontation Clause, however, guarantees only "an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might

7

wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original).

"Confrontation Clause claims are subject to harmless error analysis." United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard is whether the allegedly inadmissible evidence "'had substantial and injurious effect or influence in determining the jury's verdict.'" Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v. Lewis, 44 F.3d 1387, 1393 (9th Cir. 1994) (same).

### b. Spearman's Preliminary Hearing Testimony

Spearman was declared unavailable to testify at petitioner's trial, and his preliminary hearing testimony was read to the jury. (RT at 1448-80.) Petitioner claims the admission of Spearman's preliminary hearing testimony at trial violated his Confrontation Clause rights because petitioner did not have the opportunity to cross-examine Spearman. (Pet. at 5.)

Petitioner's claim is without merit. Although Spearman's preliminary hearing testimony is clearly testimonial, see Crawford, 541 U.S. at 68 (holding "[w]hatever else the term covers, ["testimonial"] applies at a minimum to prior testimony at a preliminary hearing"), it is undisputed that Spearman was unavailable to testify at petitioner's trial, and that petitioner had a prior opportunity to cross-examine Spearman at his preliminary hearing (RT at 1199-1200, 1464-72, 1480). Accordingly, Spearman's testimony was admissible, and the state court's decision denying relief based on the admission of such testimony, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.[6]

### c. Officers' Preliminary Hearing Testimony

Although Officers Medina and Weikel testified at petitioner's trial, their preliminary hearing testimony recounting Spearman's statements to them, which statements connected petitioner to the murder, was also introduced. (RT at 1486-1514.) Petitioner claims the admission of such earlier testimony violated his Confrontation Clause rights. (Pet. at 5.) As

---

[6]To the extent petitioner claims the state court's decision was unreasonable because he did not have a meaningful opportunity to cross-examine Spearman, the Court, as discussed infra, disagrees.

8

noted by the Court of Appeal, admission of the officers' preliminary hearing testimony involved two levels of testimonial hearsay: (1) the officers' own statements constituting such preliminary hearing testimony, and (2) Spearman's out-of-court statements to the officers as recounted by the officers in that testimony. (Ex. 9 at 6-7.)

### i. Officers' Preliminary Hearing Testimony as Read at Trial

The first level of hearsay implicated by the officers' preliminary hearing testimony consists of the officers' own statements given under oath as testimony at that prior proceeding and read at the trial. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 59, n.9. Here, both officers were called as witnesses at petitioner's trial and were subject to cross-examination by petitioner. (RT at 1515-83, 1804-20.) Accordingly, at the first level, the admission of the officers' preliminary hearing testimony did not violate the Confrontation Clause.

### ii. Spearman's Statements to the Officers

The second level of hearsay implicated by the officers' preliminary hearing testimony is the officers' account therein regarding Spearman's out-of-court statements to them. Spearman's statements to the officers are testimonial in nature. See Crawford, 541 U.S. at 52 (holding "[s]tatements taken by police officers in the course of interrogations are also testimonial"). As explained above, however, out-of-court statements that are "testimonial" in nature are admissible if (1) the witness is unavailable, and (2) the petitioner had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 59. Here, it is undisputed that Spearman was unavailable to testify at petitioner's trial. (RT at 1199-1200.) Moreover, petitioner had a prior opportunity to confront and cross-examine Spearman about Spearman's out-of-court statements at petitioner's preliminary hearing. (RT at 1464-72, 1480.) Consequently, to the extent the officers' preliminary hearing testimony contained testimony recounting Spearman's out-of-court statements to them, and to the extent petitioner previously had an opportunity to cross-examine Spearman about those statements, those statements were admissible. See Crawford, 541 U.S. at 59.

9

In this instance, an issue is presented as to the extent of such opportunity. In particular, Spearman invoked his Fifth Amendment privilege against self-incrimination in response to three questions asked of him at petitioner's preliminary hearing, all of which concerned Spearman's statements to Officer Weikel. First, on direct examination, Spearman asserted his Fifth Amendment privilege when asked by the prosecutor if he had talked to Officer Weikel about the night of the murder. (CT at 66.)[7] Next, on cross-examination, Spearman asserted his Fifth Amendment privilege when asked, with regard to a letter he had written to the district attorney in February 2000, implicating petitioner in the murder: "So you were basically offering for some type of consideration on the part of the district attorney to be able to give them a suspect?" (CT at 76.) Later, again on cross-examination, Spearman refused to answer the question, "And isn't it true that you told [the district attorney and district attorney's investigator] that you had given false testimony to an officer in May or June [of] 2000 when they came to talk to you?" (RT at 1470; CT at 78.) Petitioner contends Spearman's refusal to answer the above questions rendered inadmissible Officer Weikel's testimony recounting the statements to which those questions pertained because petitioner did not have a meaningful opportunity to cross-examine Spearman about them.

As explained above, the Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware, 474 U.S. at 20 (emphasis in original). The court's role is to ensure that a witness's refusal to answer questions does not "'effectively . . . emasculate the right of cross-examination itself.'" Delaware, 474 U.S. at 19 (quoting Smith v. Illinois, 390 U.S. 129, 131 (1968)).

Here, as the Appellate Court noted, Spearman, although called as a prosecution witness, testified favorably for the defense. (Ex. 9 at 10.) Despite Spearman's refusal to answer defense counsel's question regarding Spearman's motive for writing the district attorney, defense counsel, as the trial court observed, nonetheless "made [her] point" when

---

[7]In light of the record as discussed below, the Court does not address whether, under any given circumstances, a refusal to answer a question on direct examination would suffice to constitute a cognizable preclusion of cross-examination.

10

she was able to get Spearman to admit that he wrote the letter because he had just been sentenced to prison and, as Spearman conceded, was desperate to do "just about anything to get out of custody." (RT at 1468; CT at 75-76.) Further, Spearman also admitted on cross-examination that he told the police he would give them information if they would take care of a warrant (RT at 1465; CT at 73), that he only identified petitioner as the killer when the police told him they would recommend he be released from custody (RT at 1466; CT at 73-74), and that he was concerned about being incarcerated and therefore unable to care for his son (RT at 1469; CT at 77). Similarly, although Spearman asserted his Fifth Amendment privilege when asked whether he told the district attorney and district attorney's investigator that he "had given false testimony to an officer in May or June 2000 when [the police] came to talk to [him]" (RT at 1470), Spearman thereafter essentially answered that question in the affirmative when he then testified he had invoked his Fifth Amendment privilege because he feared being charged with perjury (RT at 1471) and that he had "just told [the police] whatever so [he] could get out" (RT at 1474).

     The Court of Appeal, having reviewed the record as to Spearman's testimony, found "[Spearman's] invocation of the Fifth Amendment . . . did not foreclose cross-examination regarding the truthfulness of his statement to Sergeant Wiekel." (Ex. 9 at 10.) This Court agrees. Although Spearman refused to answer two questions on cross-examination, defense counsel nonetheless was able to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." See Davis, 415 U.S. at 318. Spearman's refusal to answer three questions, only two of which were posed on cross-examination, did not "'effectively . . . emasculate the right of cross-examination itself,'" Delaware, 474 U.S. at 19, and petitioner thus was afforded the requisite "opportunity for effective cross-examination" guaranteed under the Confrontation Clause. Id. at 20 (emphasis omitted).

     Further, as noted above, a habeas petitioner has the burden of demonstrating the challenged testimony had a prejudicial effect on the jury. Hernandez, 282 F.3d at 1144. Spearman's statement to Officer Weikel identifying petitioner as the shooter was largely

11

cumulative of his 1995 statement to Officer Medina identifying petitioner as the shooter. (RT at 1492-95.)[8] Moreover, with or without Spearman's statements to Officer Weikel, the evidence of petitioner's guilt was strong.

First, as noted, Spearman, immediately after the shooting, had made essentially the same statement to Officer Medina. Additionally, another witness, Alicia Moore ("Moore"), also had given a statement describing the murder and identifying petitioner as the shooter (RT at 1729, 1805-08; Trial Ex. 25A (hereinafter "Ex. 3") at 19),[9] as well as having heard petitioner and Dale fighting over a drug debt (RT Ex. 3 at 8-11), and another witness, Willie Steverson, testified that a few days earlier, petitioner had threatened to "bust a cap" in Dale if he did not pay the debt (RT at 1221). Although Moore, like Spearman, recanted her statement at trial and asserted she had not witnessed anything, her testimony in that regard was substantially discredited by the testimony of a friend and neighbor, Jackline Wilson, who saw Moore shortly after the shooting and described her as "hysterical" (RT 1752-53); additionally, John Dodd, the district attorney's investigator, testified that Wilson told him that Moore had seen "everything" (RT 1785). Further, Moore's sister, Joy Wolf, testified she picked Moore up shortly after the shooting, that Moore was "afraid," "nervous," "apprehensive" and "crying" (RT 1729), and that Moore told her "[s]he had seen one guy shoot another guy (id.), that the two men had been arguing [over] $10 (RT 1730), and that at the time of the shooting, Spearman was standing next to her (RT 1730). Petitioner's letter to another inmate, by which petitioner attempted to establish a false alibi (RT at 1720-21), provided further support for the prosecution's case by showing petitioner's consciousness of guilt.

Consequently, although the Court agrees with the state court that no error occurred by reason of the admission of Spearman's statements to Officer Weikel, even if the Court were to assume such error did occur, it cannot be said, based on the record as a whole, any such

---

[8] Spearman did not invoke the Fifth Amendment when asked about his statements to Officer Medina. (CT at 56-59, 71-75, 83-   87.)

[9] Trial Ex. 25A is the transcript of the tape-recorded interview between Moore and Officer Weikel.

12

error had a substantial and injurious effect or influence" on the jury's verdict. Hernandez, 282 F.3d at 1144.

In sum, to the extent petitioner's claim is based on the trial court's admission of Spearman's out-of-court statement to Officer Weikel as recounted in said officer's preliminary hearing testimony, the Court of Appeal's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2. Ineffective Assistance Of Trial Counsel

Petitioner claims that his trial counsel provided ineffective assistance by failing to object to the admission of the preliminary hearing testimony discussed in claim one above. (Pet. at 5.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

Here, petitioner's claim of ineffective assistance of counsel arises from an issue the

13

1  Court has discussed above and found unavailing. In particular, petitioner challenges his
2  attorney's failure to object to the admission of testimony this Court has found was properly
3  admitted. Under such circumstances, petitioner is unable to meet either prong of the
4  Strickland test, and thus has not shown the state court's decision as to this claim involved
5  either an unreasonable application of Supreme Court law or an unreasonable determination of
6  the facts.

Accordingly, thus petitioner is not entitled to relief on this claim.

### 3. Failure To Instruct The Jury: Voluntary Intoxication Defense

Petitioner claims the trial court erred in failing to instruct the jury on voluntary intoxication as a defense, thereby violating his rights under the Fifth, Sixth, and Fourteenth Amendments. (Pet. at 6.) Specifically, petitioner requested a version of CALJIC 4.21. (CT at 328.) The instruction would have read as follows:

> In the crime of murder, of which defendant is accused, a necessary element is the existence in the mind of the defendant of the mental state of premeditated and deliberate attempt to kill, and the mental state of malice. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required mental states. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed a mental state, you must find that he did not have such a mental state.
> (Ex. 4 at 60; Ex. 9 at 12, n.4.)

"A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). "The error must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment. Id. "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).

A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation omitted). Due process does not require an instruction be given unless the evidence supports it. See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on

14

lesser included offense required only "when the evidence warrants such an instruction"); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (finding insufficient evidence to warrant self-defense instruction).

Although a petitioner need only show "there is evidence upon which the jury could rationally sustain the defense," Boulware, 558 F.3d at 974 (internal quotation and citation omitted), "[t]he omission of an instruction is 'less likely to be prejudicial than a misstatement of the law,'" Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155). "'[T]he significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.'" Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156).

Petitioner claims the trial court erred in not giving his requested instruction because Moore made a statement in her 2000 interview with Officer Weikel that petitioner, prior to the shooting, "had been up like three days, like snorting cocaine and crank and drinking." (Pet. at 6; Ex. 3 at 9.)[10] The California Court of Appeal rejected petitioner's claim on the ground that the evidence of intoxication was "scant at best." (Ex. 9 at 14.) In so finding, the Court of Appeal explained that Moore had specified neither the amount of drugs or alcohol actually consumed by petitioner, nor the time of consumption other than that it was "sometime during a three-day span before the shooting and 'around the period' of the day of the murder" (id.) and that no evidence had been introduced showing such consumption had any effect on petitioner's ability to form the requisite specific intent for first degree murder (id.). Further, as the Court of Appeal explained, the evidence showed "petitioner left [Cookie's] house specifically to retrieve his gun and that after petitioner shot Dale, petitioner told Spearman and Moore, "'You all ain't seen nothing,' suggesting [petitioner] was unafraid

---

[10]At trial, Moore did not offer any testimony on the subject, and, as discussed above, the defense was based on identity, not mental state.

15

to shoot Dale in front of two witnesses because he believed he could control them, not because his reasoning was impaired." (Id.) Additionally, as the Court of Appeal observed, the testimony of another witness, Adriane McCoy, who saw petitioner shortly after the shooting, was that "there was nothing unusual about [petitioner's] demeanor or tone of voice [and that he 'seemed normal.'" (Id.) Based on the evidence at trial, the Court of Appeal found the trial court did not err in refusing to instruct the jury on voluntary intoxication. (Id. at 15.)

Having reviewed the record, this Court concludes the state appellate court was not "objectively unreasonable" in finding the evidence did not warrant a voluntary intoxication instruction.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4. Improper Restitution Fine

Petitioner claims the trial court improperly imposed an "unauthorized" restitution fine of $10,000. (Pet. at 6.) The Contra Costa County Superior Court denied petitioner's claim on September 8, 2005, finding the fine was properly imposed. (Ex. 15.) The California Court of Appeal and Supreme Court of California both summarily denied petitioner's claim. (Exs. 16, 18.)

Petitioner's claim alleges only a violation of state law, and, consequently, is not cognizable in federal habeas corpus proceedings. A state prisoner can obtain federal habeas corpus relief only if he is held "in violation of the Constitution or laws and treaties of the United States." Engle v. Isaac, 456 U.S. 107, 119 (1982). Federal habeas corpus is not available for attacks on violations of state law or procedure, Estelle v. McGuire, 502 U.S. 62, 67 (1991), and is "'unavailable for alleged error in the interpretation or application of state law.'" Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994) (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).

Further, habeas corpus is the appropriate remedy for a state prisoner who challenges "the fact or duration of his confinement and seeks immediate or speedier release." Heck v. Humphrey, 512 U.S. 477, 481 (1994). The federal writ of habeas corpus is available only to

persons "in custody" at the time the petition is filed. 28 U.S.C. §§ 2241(c), 2254(a); see Carafas v. LaVallee, 391 U.S. 234, 238 (1968). In general, custody is satisfied where the sentence imposed "significantly restrain[s] [a] petitioner's liberty to do those things which in this country free men are entitled to do." Jones v. Cunningham, 371 U.S. 236, 243 (1963). A monetary fine is not a sufficiently significant restraint on liberty to satisfy the custody requirement. See Dremann v. Francis, 828 F.2d 6, 7 (9th Cir. 1987). Nor does the fact that petitioner also challenges his custody suffice to confer jurisdiction on this Court to review his restitution claim by way of a federal habeas petition. See United States v. Thiele, 314 F.3d 399, 401-02 (9th Cir. 2002) (holding petitioner could not collaterally attack restitution order under § 2255, even where joined with cognizable claims for release from custody).

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.  Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing and, accordingly, a certificate of appealability will be denied.

//

**CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: August 12, 2011

_____
MAXINE M. CHESNEY
United States District Judge